**Affirmed and Opinion filed August 25, 2016.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## NO. 14-15-00380-CR

**GUSTAVO ANDRES VASQUEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 230th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1412198**

## O P I N I O N

This is an appeal from a conviction for murder. In six issues, appellant argues that the trial court erred by excluding evidence that was relevant to his defense, by admitting evidence of his custodial statements, and by overruling objections to an improper closing argument. Finding no reversible error, we overrule each issue and affirm the trial court's judgment.

# I. BACKGROUND

Appellant was charged with murdering his wife, the complainant, who was found dead in her home after having been shot seven times with a shotgun. The State's theory was that appellant killed the complainant in a fit of rage after she kicked him out of their home for using drugs. Appellant did not dispute his role in the killing, but he asserted an affirmative defense and claimed he was temporarily insane because of an involuntary intoxication.

The complainant's sister testified at trial. She said that she lived with appellant and the complainant, and that they would often argue over his drug habits. The sister explained that appellant regularly smoked marijuana. Less frequently, he would also smoke a substance that smelled like cow manure.

According to the sister, appellant left the house on the night before the murder after he got into an argument with the complainant. When he returned home the following afternoon, appellant appeared mad, upset, and aggressive. The sister left the house after appellant's return. Shortly after that, appellant shot the complainant.

Later that day, police were dispatched to the home after receiving a call from appellant's mother. When officers knocked on the door, appellant came outside and attempted to shoot them. He pumped his shotgun three or four times but it never fired because the chamber was empty. Appellant then barricaded himself inside of the home.

Police surrounded the property. After nearly an hour-long standoff, police eventually convinced appellant to come outside. Speaking with him through his cellphone, police instructed appellant to walk backwards down his sidewalk and towards their position on the street. When he reached a certain point, appellant

2

hesitated. He then slammed his cellphone into the ground and he ran into his backyard. Once there, he was subdued by law enforcement. One of the officers who witnessed the arrest testified that appellant kept saying, "I can't do this, I can't do this." The officer also opined that appellant appeared "kind of paranoid."

Appellant was escorted to the back of a patrol car. When an investigator saw that appellant was slumped over in the backseat, the investigator asked appellant if he had any health issues. Appellant's response was, "I'm sorry. I shouldn't have done it. I've been under so much stress lately." He then said that he had no health issues and requested some water.

Appellant was taken into custody that night to be processed. In a holding area, appellant announced that he was going to break out of his handcuffs. One of the officers overheard that statement and saw that appellant was attempting to free himself from the handcuffs. The officer placed a second pair of handcuffs on appellant. The officer also observed appellant speaking incoherently about airplanes and aliens. The officer documented that appellant may have been under the influence of a substance.

A recorded interview was conducted the following day, nearly twenty-four hours after appellant's arrest. In the interview, appellant explained that he and the complainant had been having a typical argument on the night before the shooting. Appellant said that he left the house to spend the night with his mother. He returned at around 3:00 a.m. but the complainant refused to let him back inside.

In the afternoon, after coming home from work, appellant said that he was aggravated and feeling underappreciated. He said that he got into another fight with the complainant after her sister had left the house. He claimed that he grabbed his shotgun, which went off accidentally and hit the complainant. When the

interrogating officer asked why appellant had grabbed the shotgun, appellant responded, "Just rage."

Appellant said that he had called his mother after shooting the complainant because he felt scared. Appellant also revealed that he had called a lawyer "just to kind of see what was going on, call you guys"—gesturing towards the interrogating officer—and to "straighten all this situation, this mess." The officer, who would later testify that he had not been aware of the call to the lawyer at the time of the interview, asked what the lawyer had said. Before appellant could answer, the officer withdrew his question.

During the interview, appellant told the officer that he might have been under the influence of PCP at the time of the shooting. He explained, "It's just my drug of choice. It helps me escape and relax."

Prior to trial, appellant moved to suppress the statements he had made in the back of the patrol car and in the recorded interview. Appellant argued that the statements from the patrol car were inadmissible because they were uttered during a custodial interrogation and without the benefit of his *Miranda* warnings. As for the recorded interview, appellant argued that the statements were inadmissible because he was intoxicated and because the waiver of his right to counsel had been invalid.

The trial court denied the motion to suppress. The court found that that the statement from the back of the patrol car was not the result of a custodial interrogation because the investigator's question pertained to appellant's health, rather than the offense. Regarding the recorded interview, the court found that appellant had waived his rights freely, voluntarily, and intelligently. The court also determined that appellant's right to counsel had not been violated because there

4

was no evidence that appellant had ever retained an attorney or that he had desired to stop the interview to have an attorney present.

At trial, appellant called several witnesses in his defense. The first witness was a professor of pharmacology, who testified about the intoxicating effects of PCP. The professor explained that PCP is often consumed in conjunction with other narcotics, and that its effects are similar to schizophrenia or bipolar disorder. For example, a person on PCP can hallucinate, exhibit symptoms of paranoia, or become violent. When asked whether a person under the influence of PCP can know the difference between right and wrong, the professor testified, "It's possible," and "this depends on the person and on their background in terms of use of drugs."

Appellant's supervisor also testified. He said that appellant had been acting abnormally on the day of the shooting. The supervisor explained that appellant had locked himself out of a warehouse. Despite knowing about an alternative entrance, appellant still needed assistance to get back inside. The supervisor also said that appellant was pacing back and forth, and that he appeared "spun" and very confused. After appellant had left for the day, the supervisor contacted a former coworker and asked that he check in on appellant because his behavior had been so unusual.

A family friend testified that he saw appellant at the police station on the night of the murder. The friend said that appellant resembled a "wild man." The friend explained that appellant's eyes were "real white and, you know, open real wide. And he just didn't look right."

Appellant attempted to elicit opinion testimony from both his supervisor and the family friend about whether they believed that appellant could have appreciated the difference between right and wrong. The asserted basis for this opinion

testimony was the witnesses' observations of appellant on the day of the shooting, as well as their knowledge that appellant was in a loving relationship with the complainant. The trial court did not allow the witnesses to provide their opinion testimony in front of the jury. But in a bill of exceptions, the witnesses opined that appellant would not have harmed the complainant had he known the difference between right and wrong.

Appellant also attempted to elicit testimony from a forensic psychologist but the trial court determined that her testimony was inadmissible. Outside the presence of the jury, the psychologist testified that she had evaluated appellant twice. In her opinion, appellant was under the intoxicating effects of a substance at the time of the shooting and he likely did not know the difference between right and wrong.

Appellant testified as well. He said that he has had a drug habit for more than twenty years. He primarily smokes marijuana, which costs him between fifty and a hundred dollars each day. In the month preceding the murder, he said that he was also smoking PCP every other day, at a cost of roughly twenty dollars per transaction.

On the day before the murder, appellant purchased marijuana from a new dealer. Appellant said that this marijuana made him feel lightheaded, nauseated, and a little edgy. Appellant smoked three blunts before he realized that the marijuana was making him sick. The last blunt was smoked on the day of the murder, when appellant was at work.

Appellant suggested that this new marijuana may have been laced with PCP. He testified that he intentionally and voluntarily smoked the marijuana, but he did not intend to smoke PCP.

Appellant acknowledged that he and the complainant would fight frequently over his drug use. Appellant said that they fought about that very subject on the night he was kicked out. The next day, however, after he had returned home from work, he said that their fight was over some watches that he had given away.

Appellant testified that he did not remember shooting the complainant. Nor did he remember having to reload his shotgun, which had a capacity for only six cartridges. Appellant said that if he had been able to appreciate the difference between right and wrong, he never would have killed the complainant.

The trial court instructed the jury on the affirmative defense of involuntary intoxication, but the jury rejected that defense, convicted appellant as charged, and sentenced him to life imprisonment.

## II. EXCLUSION OF TESTIMONY

In his first issue, appellant argues that the trial court reversibly erred by excluding testimony from his expert and lay witnesses to the effect that appellant did not know the difference between right and wrong at the time of the shooting. Appellant contends that this testimony was relevant and admissible because, to prove an insanity defense based on involuntary intoxication, the defendant must show that he did not know that his conduct was wrong. *See* Tex. Penal Code § 8.01(a); *Farmer v. State*, 411 S.W.3d 901, 912 (Tex. Crim. App. 2013) (Cochran, J., concurring).

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). A trial court abuses its discretion when its decision is arbitrary, unreasonable, or without reference to guiding rules or principles. *See State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). We examine the trial court's decision in light of

what was before the trial court at the time the decision was made. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). The trial court's decision will be upheld if it is reasonably supported by the record and correct under any theory of law applicable to the case. *See Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

## A.     The Expert Witness

Outside the presence of the jury, the psychologist discussed her qualifications and how she had evaluated appellant's condition. The psychologist determined that appellant had not been suffering from a severe mental illness at the time of the shooting. However, the psychologist opined that appellant was under the influence of an intoxicating substance, which might have prevented him from knowing that his conduct was wrong.

The trial court expressed a concern over the admissibility of the psychologist's proffered testimony. The court began by examining Section 8.01(a) of the Texas Penal Code, which provides as follows: "It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." The court focused on the final clause of this statute: "did not know that his conduct was wrong." The court believed that the psychologist's testimony did not comport with this statutory requirement because, as the court explained, "[T]he standard is 'did not know,' not 'may not have known.'"

Appellant recalled the psychologist to the stand to clarify her testimony (again, outside the presence of the jury):

Q.     [B]ased on what you saw in terms of your observation of [appellant], right—based on your observation of him, based on the history that was given to you and the reactions that were described to

you, assuming those thing[s] to be true—assuming them to be true, can you say that he did not appreciate right from wrong?

A.    Correct. I think there's enough corroborating evidence. The police reports show that he was disorganized and making bizarre statements, that his behavior was fairly bizarre around that time. I think there is enough supporting evidence to say that.

On cross-examination, the prosecutor used the psychologist's written report to undermine her expert opinion. In that report, the psychologist made the following finding: "There was little to suggest that [appellant] was experiencing hallucinations or delusions at the times of the alleged offenses or that he did not understand the difference between right or wrong when he was committing the crime." When questioned about this finding, the psychologist responded that her report was written in the context of a specific type of sanity evaluation, which only considered whether appellant had been suffering from a severe mental illness. The psychologist testified that the finding would change based on an evaluation of whether appellant had been temporarily insane because of an intoxicating substance.

The prosecutor asked once more, "[A]t the end of all this, did the defendant—did he know that his conduct was wrong?" The psychologist responded, "Again, it's hard. . . . It's difficult for me to answer that question."

The trial court found that the psychologist was qualified to render an expert opinion, but the court excluded her testimony because the psychologist could not definitively say that "at the time, he did not know that his conduct was wrong." The court further explained that "there was still some equivocation in what she was saying."

The trial court's ruling was erroneous. The certainty of the psychologist's opinion affected the weight of her testimony, not its admissibility. *Cf. Moore v.*

*State*, 700 S.W.2d 193, 198 (Tex. Crim. App. 1985) ("The fact that a witness cannot be positive in his identification of another person goes to the weight of his testimony, not to its admissibility."); *Mays v. State*, 563 S.W.2d 260, 263–64 (Tex. Crim. App. 1978) (an expert pathologist could testify about the relative positions of the parties at the time of the shooting, even though the expert was absent, because his absence goes to the weight of the evidence, not its admissibility). We conclude that the trial court abused its discretion by excluding the psychologist's testimony.

**B.    The Lay Witnesses**

The supervisor and the family friend testified that they had observed appellant and the complainant together, as a couple, during previous social encounters. Both witnesses also explained that appellant and the complainant were "very close" and "very much in love." Based on this perception of appellant's marital relationship, appellant asked the witnesses for their opinion as to whether he would have harmed the complainant had he known right from wrong, taking into consideration their additional observations of appellant on the day of the shooting.

When appellant elicited such testimony from the supervisor, the State asserted the following legal objections: "lack of knowledge, invading the province of the jury, speculation and assumptions based on the fact he wasn't there." The trial court sustained the objections. When appellant elicited the same testimony from the family friend, the State objected again, without stating any legal basis for the objection. The trial court sustained the objection, presumably for the same reasons as before.

Rule 701 of the Texas Rules of Evidence provides that a lay witness may testify in the form of an opinion if (1) the opinion is rationally based on the

10

witness's perception, and (2) the opinion is helpful to clearly understanding the witness's testimony or to determining a fact in issue. *See* Tex. R. Evid. 701. A trial court must evaluate both requirements when deciding whether a lay witness's testimony is admissible under the rule. *See Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997).

The initial requirement that an opinion must be rationally based on the perceptions of the witness is itself composed of two parts. *Id.* First, the witness must establish personal knowledge of the events from which his opinion is drawn. *See Davis v. State*, 313 S.W.3d 317, 349 (Tex. Crim. App. 2010). Personal knowledge will often come directly from the witness's senses and experiences. *See Fairow*, 943 S.W.2d at 898. An opinion will satisfy the personal knowledge requirement if it is an interpretation of the witness's objective perception of events. *Id.* at 899.

Once the perception requirement is satisfied, the trial court must then determine if the opinion is rationally based on that perception. *Id.* at 899–900. An opinion is rationally based on a perception if it is an opinion that a reasonable person could draw under the circumstances. *Id.* at 900. The witness's testimony can include beliefs or inferences as long as they are drawn from his own experiences or observations. *See Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).

The second requirement for admissibility under Rule 701 is that the opinion must be helpful to the trier of fact in either clearly understanding the witness's testimony or in determining a fact in issue. *See Fairow*, 943 S.W.2d at 900. There is no bright-line rule for indicating when an opinion is helpful, but general evidentiary considerations of relevance and balancing may assist the trial court in making the determination. *Id.*

In this case, both lay witnesses opined outside the presence of the jury that appellant would not have harmed the complainant had he been in his right mind. The basis for this opinion was the witnesses' perceptions of appellant's loving relationship with the complainant, as well as their observations of appellant's abnormal behavior on the day of the shooting. We can assume for the purposes of argument that this opinion was rationally based on each witness's own senses and experiences.

"[T]he rule in this state is that a lay witness may recount germane observations of an accused and give an opinion that [the] accused is insane on account of some abnormality of the mind." *Pacheco v. State*, 757 S.W.2d 729, 733 (Tex. Crim. App. 1988). The lay witnesses in this case described their observations of appellant on the day of the shooting, but they were not permitted to opine on the issue of appellant's sanity, which may have been helpful to the jury. *See Lape v. State*, 893 S.W.2d 949, 962 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). Assuming without deciding that the trial court abused its discretion by excluding the lay witnesses' opinion testimony, we now consider whether the trial court's error in excluding the expert witness's proffered testimony and presumed error in excluding the lay witnesses' testimony resulted in harm.

## C.    Harm Analysis

The Rules of Appellate Procedure provide for two different standards for reversible error in criminal cases. If the error is of constitutional magnitude, the reviewing court must reverse the judgment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment. *See* Tex. R. App. P. 44.2(a). If the error is nonconstitutional, the reviewing court must disregard it unless the error affected the defendant's substantial rights. *See* Tex. R. App. P. 44.2(b).

12

Appellant argues that the trial court's errors are constitutional because the errors denied him a fundamental component of due process—namely, the opportunity of presenting his defense to the jury. We disagree. "[T]he exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002). Here, appellant was not precluded from presenting his defense. When appellant took the stand, he testified that he would not have killed the complainant had he been able to appreciate right from wrong. This was the very same testimony that appellant had sought to develop from the expert and lay witnesses. The charge also included an instruction on involuntary intoxication, which means that the jury was able to consider appellant's defensive theory. Even though appellant was unable to "present his case to the extent and in the form he desired . . . he was not prevented from presenting the substance of his defense to the jury." *Id.* at 666. Therefore, we must review the trial court's errors under the standard for nonconstitutional error.

Nonconstitutional error must be disregarded unless it affects a defendant's substantial rights. *See* Tex. R. App. P. 44.2(b). An error affects a defendant's substantial rights when the error has a substantial and injurious effect or influence on the jury's verdict. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). If the error had no or only a slight influence on the verdict, the error is harmless. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

When assessing harm, we consider "everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *See Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). We also consider the jury

instructions given by the trial court, the State's theory and any defensive theories, closing arguments, and even voir dire, if material to the defendant's claim. *Id.*

Appellant points to the State's closing argument, in which the prosecutor addressed the defense of involuntary intoxication. The prosecutor stated:

> It requires two things. One, no independent judgment or volition of taking the intoxicant. And two, did not know his conduct was wrong. Well, I mean, ladies and gentlemen, correct me if I'm wrong. But not one person came in here and told you he did not know what he was doing was wrong. They haven't met their burden.

Appellant contends that this argument demonstrates harm because, had his witnesses been allowed to testify, there would have been affirmative evidence that he was temporarily insane. But the record did contain such evidence because appellant testified directly that he would not have killed the complainant had he been able to appreciate right from wrong. And at trial, defense counsel was quick to object that the prosecutor's statement was a "mischaracterization of the evidence."

Even if the expert and lay witnesses had been allowed to present their opinions to the jury, their testimony would have supported just one element in appellant's affirmative defense. To be acquitted under that defense, appellant was still required to show that his intoxication was involuntary. The sole evidence that appellant was involuntarily intoxicated was his own testimony that he only intended to smoke marijuana, not PCP. However, that claim was extenuated by appellant's admissions that PCP was his "drug of choice" and that he smoked it every other day to "escape and relax." Appellant testified that he felt sick after smoking the marijuana, but he smoked three blunts over two days before he claimed to have discarded the marijuana. The jury could have reasonably concluded that appellant continued to smoke the marijuana because he knew that it

was adulterated and he desired its intoxicating effects. When considered alongside appellant's admissions, this evidence points strongly in the direction of a voluntary intoxication.

We also note that appellant's own expert opined that appellant "voluntarily took the substance." The prosecutor also emphasized during a later part of her closing statements that appellant's persistence in smoking the "funny weed" demonstrated the voluntariness of his intoxication. Thus, the jury had a basis for rejecting appellant's affirmative defense that was unaffected by any error in the exclusion of the opinion testimony.

We cannot say that the excluded testimony from the expert and lay witnesses would have had a substantial effect on the jury's verdict. At best, the influence of the excluded testimony would have been slight. We therefore conclude that any errors in the exclusion of such testimony were harmless.

### III. MOTION TO SUPPRESS

In his next two issues, appellant complains about the trial court's ruling on the motion to suppress. We review such rulings under a bifurcated standard. *See Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). First, we afford almost total deference to a trial court's determination of historical facts. *Id.* The trial court is the sole trier of fact and judge of the credibility of witnesses and of the weight to be given their testimony. *Id.* The trial court may believe or disbelieve all or part of a witness's testimony, even if that testimony is uncontroverted, because the court has the opportunity to observe the witness's demeanor and appearance. *Id.* If the trial court makes express findings of fact, as the court did here, we view the evidence in the light most favorable to the trial court's ruling and determine whether the evidence supports the factual findings. *Id.*

Second, we review de novo the trial court's application of the law to the facts. *Id.* We will sustain the trial court's ruling if the ruling is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id.*

## A. The statements from the recorded interview were not taken in violation of appellant's right to counsel.

In his second issue, appellant argues that the trial court should have suppressed the recorded interview because his statements in that interview were obtained in violation of his Sixth Amendment right to counsel. More specifically, appellant argues that his waiver of his right to counsel was invalid because he was represented at the time of the interview, but his counsel was not present to consent to the waiver.

Appellant relies on *Holloway v. State*, which held that a unilateral waiver of the right to counsel is invalid if the Sixth Amendment has attached and the defendant has obtained representation.[1] *See Holloway v. State*, 780 S.W.2d 787, 796 (Tex. Crim. App. 1989). In cases following *Holloway*, courts have held that, when the defendant challenges the validity of a unilateral waiver of his right to counsel, the defendant has the initial burden of showing the existence of an attorney-client relationship. *See Arabzadegan v. State*, 240 S.W.3d 44, 53 (Tex. App.—Austin 2007, pet. ref'd). When that relationship is predicated on the services of retained counsel, the defendant must also demonstrate that counsel has agreed to the representation. *Id.* at 51–52.

---

[1] The State did not address *Holloway* in its brief. Based on our research, *Holloway* may no longer be good law. *See Montejo v. Louisiana*, 556 U.S. 778, 789 (2009) (finding no constitutional impediment to a unilateral waiver); *Hughen v. State*, 297 S.W.3d 330, 335 (Tex. Crim. App. 2009) (same). For purposes of argument, we will assume that *Holloway* still applies, because the outcome is the same in any event.

16

Appellant stated during his interview that, before he was taken into custody, he had called a lawyer by the name of Philip Azar. Appellant suggests in this court that he had retained Azar prior to his recorded interview. However, no lawyer by that name represented appellant at the hearing on the motion to suppress or, from what we can discern, at any stage of appellant's criminal proceedings. Furthermore, no lawyer by that name testified at the hearing on the motion to suppress, and appellant produced no evidence at that hearing showing that a lawyer by that name had agreed to represent him. Given the dearth of evidence on this subject, we cannot say that the trial court abused its discretion when it determined that appellant had not retained a lawyer. We therefore conclude that appellant did not meet his burden of showing that his waiver of his right to counsel was invalid.

**B.    The trial court did not abuse its discretion by finding that appellant freely, voluntarily, and intelligently waived his rights at the beginning of the recorded interview.**

In his third issue, appellant argues that the trial court should have granted his motion to suppress because his statements were given when he was intoxicated. The factual discussion in appellant's brief includes references to two separate statements—those from the patrol car and those from the recorded interview—but the argument section exclusively addresses just one—those statements from the recorded interview. We limit our analysis accordingly.

Appellant asserts that he was still intoxicated by PCP at the time of his recorded interview. He references parts of the video in which he claims that he "is clearly disoriented, confused, and does not know what day or time it is." Based on this claimed evidence of intoxication, appellant argues that he was incapable of making an independent and informed decision to speak with his interrogating officer. Citing both *Miranda* and Article 38.22 of the Code of Criminal Procedure, appellant contends that the recorded interview should have been suppressed.

17

We begin by analyzing whether appellant validly waived his rights under *Miranda*. The State has the burden of showing by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. *See Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). There are two facets to this inquiry. *See Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001). First, the waiver must be voluntary in the sense that it was the product of a free and deliberate choice, and not of official intimidation, coercion, or deception. *See Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). Second, the waiver must be made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id.*

Appellant does not contend, and there is no evidence to suggest, that he was intoxicated because PCP was administered to him by the police. Without such evidence of official coercion, any suggestion that PCP may have influenced appellant's decision to waive his rights will not undermine the voluntariness of his subsequent statements, at least for purposes of the Fifth Amendment. *Cf. Ripkowski*, 61 S.W.3d at 384 ("If appellant's cocaine use and mental disorders alone impelled him to confess, that is of no constitutional consequence.").

Appellant's use of PCP could have had a bearing on his comprehension, however, and that is a relevant factor when determining whether his waiver was knowing and intelligent under *Miranda*. *See Leza*, 351 S.W.3d at 351. We must therefore consider the evidence developed at the hearing on the motion to suppress.

The interrogating officer testified that he first encountered appellant at the scene of the crime, after appellant had already been taken into custody. The officer said that he had no real interactions with appellant that evening, but the officer had heard from other officers that appellant may have been under the influence of a

narcotic. The officer decided that he would not interview appellant that night "[j]ust in case he was under the influence of anything."

The interview was conducted nearly twenty-four hours later. The officer testified that, at that time, his observation of appellant was "[n]othing out of the ordinary." The officer read appellant his rights, one at a time, and appellant stated that he understood each right. The officer testified that he did not see anything that would make him believe that appellant was intoxicated. The trial court credited the officer's testimony and, in its findings of fact, the court determined that appellant "understood what was being asked of him, what was occurring around him, and made appropriate answers to the questions he was asked." The trial court did not abuse its discretion by concluding that the State had satisfied its burden of demonstrating that appellant had validly waived his rights under *Miranda*.

We now consider whether appellant's waiver was valid under Article 38.22. This statute provides that the defendant must knowingly, intelligently, and voluntarily waive his rights before his recorded statements may be admitted into evidence. *See* Tex. Code Crim. Proc. art. 38.22, § 3(a)(2). This standard is similar to the inquiry we make under *Miranda*, except that on the question of voluntariness, the waiver "need not be predicated on police overreaching." *See Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008). Factors that may support a statutory claim of involuntariness include: (1) the defendant was ill and on medication; (2) the defendant was mentally retarded, or he lacked the mental capacity to understand his rights; and (3) the defendant was intoxicated. *Id.* at 172–73. The Court of Criminal Appeals has cautioned, however, that intoxication by itself is usually not enough to render a statement inadmissible. *Id.* at 173.

19

As mentioned above, the trial court credited the officer's testimony that he did not see appellant exhibiting any signs of intoxication. The trial court also found that there was "a significant passage of time from the original police call to the recorded oral statements," implying that if appellant had been intoxicated at the time of the shooting, he was not intoxicated at the time of the interview. The trial court reviewed the video, and its finding that appellant understood his rights and voluntarily waived them is supported by the record. Deferring to that finding, we conclude that the trial court did not abuse its discretion by denying appellant's motion to suppress. *See Leza*, 351 S.W.3d at 352–53.

## IV. JURY ARGUMENT

In his final three issues, appellant challenges various aspects of the prosecutor's closing argument to the jury.

### A. Appellant did not preserve error on his claim that the prosecutor had improperly commented on his right to counsel.

The prosecutor spent much of her closing argument attacking the appellant's defensive theory that he was involuntarily intoxicated. In one part of her argument, the prosecutor made the following remarks:

> Now, they want you to believe that this crazy erratic behavior, that nobody would ever do something like this. Are you kidding? People run from the police every day. People try to shoot police officers every day. His behavior wasn't any different than anybody else who's just murdered their wife and is trying to get away did [sic] with it.
>
> So, he stands in the house and he's barricaded himself and he doesn't know what to do. So, what do you do after you kill your wife? You call 911, right? I mean, that's what somebody does when they love somebody so much. And even if they are so drugged out that they cannot physically remember what's going on or how they're reloading a gun, you call 911 when you see your wife on the floor. He doesn't

20

do that. He calls his momma. And they what's the next call he makes? His lawyer.

Ladies and gentlemen, if that's not the actions of somebody who is guilty and knows what they are doing, then I don't know what is.

In his fourth issue, appellant argues that the prosecutor's argument was improper because it impermissibly commented on his constitutional right to counsel.

"To preserve error in prosecutorial argument, a defendant must pursue to an adverse ruling his objections to jury argument." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). Appellant did not object to the prosecutor's argument. Accordingly, he preserved nothing for appellate review. *See* Tex. R. App. P. 33.1; *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004).

**B.    Appellant's objection to another closing argument was not sufficiently specific to preserve error.**

Later during her closing statements, the prosecutor addressed the charge instructions on voluntary and involuntary intoxication. The argument proceeded as follows:

STATE:    Now, they want you to also look at this charge of involuntary intoxication. And, ladies and gentlemen, this is in here—not because the Judge thinks it's actually valid, but because some evidence may have been raised.

DEFENSE:  Objection, Your Honor, that's improper argument.

COURT:    Overruled.

In his fifth issue, appellant argues that the trial court erred by overruling his objection because the prosecutor had improperly commented on a presumed opinion of the trial judge.

To preserve an issue for appeal, a party must make a timely objection that states the specific ground for the objection, unless the specific ground is apparent from the context. *See* Tex. R. App. P. 33.1. Ordinarily, a plain objection to an "improper argument" is too general to preserve error. *See Hougham v. State*, 659 S.W.2d 410, 414 (Tex. Crim. App. [Panel Op.] 1983). A general objection can be sufficient, however, when the record shows that the trial court understood the nature of the objection. *See Everett v. State*, 707 S.W.2d 638, 641 (Tex. Crim. App. 1986). A trial court's understanding of an objection may be evidenced by comments or admonitions made after its ruling. *Id.*

We conclude that appellant's objection of "improper argument" is insufficient to preserve error because the objection was general, rather than specific, and the trial court did not make any statements that would indicate its understanding of the nature of the objection. *See Miles v. State*, 312 S.W.3d 909, 911 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

**C.     There is no reason to conduct a harm analysis for constitutional error based on the cumulative effect of the prosecutor's two closing arguments.**

In his sixth issue, appellant asks that we perform a harm analysis for constitutional error based on the cumulative effect of the two closing arguments recited in issues four and five. We hold that there is no occasion to perform such an analysis.

We review "errors" for harm. *See* Tex. R. App. P. 44.2. "The *parties* do not ordinarily commit error; the *trial court* does, whenever it acts, or fails to act, over the legitimate objection of a party . . . ." *Snowden v. State*, 353 S.W.3d 815, 821 (Tex. Crim. App. 2011) (emphasis in original). As we made clear in our discussion of appellant's fourth issue, there was no objection to the prosecutor's closing

argument. If that argument was improper, the impropriety was the product of the prosecutor, not the trial court. The trial court had no opportunity to commit an error because it was never asked to make a ruling and it had no duty *sua sponte* to address the prosecutor's argument.

There was an objection to the other closing argument discussed in appellant's fifth issue, but that objection was not sufficiently specific to preserve error. Because no error was preserved between either of appellant's complaints, Rule 44.2 is not triggered. We therefore decline appellant's invitation to perform a harm analysis for constitutional error.

## V. CONCLUSION

The trial court's judgment is affirmed.


/s/    Tracy Christopher
Justice


Panel consists of Justices Boyce, Christopher, and Jamison.
Publish — Tex. R. App. P. 47.2(b).