**Opinion issued August 24, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-22-00519-CR**

———————————

**PAUL GENNUSA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 228th District Court**
**Harris County, Texas**
**Trial Court Case No. 1690746**

---

**MEMORANDUM OPINION**

A jury found appellant, Paul Gennusa, guilty of burglary of a habitation,[1] enhanced with a prior conviction for assault on a family member as a repeat offender. The jury further assessed Gennusa's punishment at 35 years'

---
[1] *See* TEX. PENAL CODE § 30.02.

confinement. In three issues on appeal, Gennusa's argues that (1) the trial court abused its discretion by having Gennusa's legs shackled during trial; (2) the trial court abused its discretion by allowing improper jury argument from the State; and (3) the judgment of conviction should be reformed to reflect that he was convicted of burglary of a habitation with intent to commit aggravated assault. Because we conclude that Gennusa was not harmed by the trial court's error in leaving him shackled during trial, nor was he harmed by the State's jury argument, we affirm the judgment but modify it to reflect that Gennusa was convicted of burglary of habitation with intent to commit aggravated assault.

## Background

Christian Marrder, the neighbor of the complainants Howard and Rhonda Rogers, was driving home when he observed a man on a motorcycle behaving erratically. The man on the motorcycle drove into Marrder's neighborhood and stopped at the Rogers' house. Marrder watched the man, who he later identified as Gennusa, force his way past Rhonda Rogers. When he heard Rhonda scream, Marrder called 9-1-1. Less than a minute later, Marrder saw Howard Rogers wrestling with Gennusa in the Rogers' front yard. Howard Rogers was bleeding profusely. Gennusa fled on foot.

Rhonda Rogers testified that she and her husband were preparing to leave for dinner, and her husband had just stepped out of the shower, when she heard a

2

motorcycle and her husband saw someone approaching the door. Rhonda identified Gennusa as the man who came to the door, and she testified that he asked whether she had seen his dog. She cracked the door to talk to him, and he insisted that she had stolen his dog. She told him she had not seen his dog and tried to close the door. Gennusa pulled a knife out of his pocket and forced his way into her house. She shouted to her husband to get his gun, warning him that Gennusa had a knife. She saw Gennusa charge up the stairs toward her husband, and she ran out the back door to get help.

Howard Rogers testified that he heard Rhonda scream and then saw Gennusa rushing up the stairs toward him. He fought with Gennusa inside the house. Gennusa stabbed Howard several times, but Howard was eventually able to chase Gennusa from the house. As he left the house, Gennusa dropped the knife, and Howard picked it up. Gennusa tried to get on his motorcycle to ride away, but Howard used the knife to puncture the tires. Gennusa fled on foot. He was arrested outside a nearby dance studio.

Howard sustained multiple injuries, including gashes on his head, neck, and arm. He also had stab wounds to his stomach. He spent more than a week in the hospital recovering from the injuries he sustained. Howard and Rhonda both testified during the punishment phase of the trial about the impact the crime had on them. They moved to a new house in a "safer" neighborhood but continued to be

3

fearful about opening the door to people. Howard continued to have numbness and other physical effects from the assault.

The State also presented evidence from Brigette Roulaine, whose niece was taking a class at the nearby dance studio. While Roulaine was waiting, she saw a man covered in blood come around the corner and attempt to enter the dance studio. Roulaine called 9-1-1. The responding officer, A. Villareal, arrived and observed Gennusa behaving erratically. He detained Gennusa, who was eventually charged with burglary of a habitation with the intent to commit aggravated assault.

The jury found him guilty of the offense of burglary of a habitation with the intent to commit aggravated assault, as instructed by the jury charge. Gennusa also chose to have the jury assess his punishment, and the jury found that he should be confined for 35 years. Although the indictment, jury charge, and evidence at trial indicated that Genussa was charged with and convicted of the offense of burglary of a habitation with the intent to commit aggravated assault, the trial court's judgment of conviction reflected that Gennusa was convicted of burglary of a habitation with the intent to commit theft. This appeal followed.

**Shackling**

In his first issue, Gennusa argues that the trial court reversibly erred in denying his counsel's request to remove his leg shackle prior to the trial.

## A.      Relevant Facts

During voir dire, while both sides were making their strikes, defense counsel became aware that Gennusa was shackled, telling the trial court, "Judge, I was not aware that my client was shackled. So I told him to move seats, and it was only once he moved that I realized he was shackled. I'm not sure why, and I'm sure that that front row saw." Defense counsel went on to explain, "I looked down at the table; and the way his feet were, I didn't see any chains. And, so, I said, oh, let's us move and it was only when I came around that I saw it but they did not move him. That's on me. I just was not aware that he was shackled."

The trial court questioned why Gennusa was shackled, observing that it was generally not necessary or proper to have a defendant shackled in the courtroom for a trial. The deputy in the courtroom stated simply that Gennusa was "in custody," and he stated that Gennusa "was blocked off from both angles so the jurors couldn't see him; and I made it known to the folks that, you know, he's not going to be moved in view of the panel or the jury should it be selected." The trial court and defense counsel agreed that the restraints on Gennusa's legs were not visible unless Gennusa moved, but defense counsel nevertheless objected to Gennusa's being shackled absent the articulation of some particular justification for restraining him.

The trial court proceeded to question the venire panel. Several members of the venire saw the restraints, but only one of those—Juror 12—was eventually seated on the jury. When the trial court asked Juror 12 whether he had observed anything unusual when Gennusa stood up, Juror 12 stated that he saw Gennusa's leg restraints. Defense counsel asked, "[I]f you were chosen on this jury, [would you use] that information [i.e., the fact that Gennusa was wearing leg irons] in deciding guilt/innocence in this case?" Juror 12 answered, "No."

Two other members of the venire panel—Jurors 2 and 8—saw the shackles and indicated that it would impact their consideration of Gennusa's guilt or innocence, and therefore should be struck. The trial court pointed out, however, that those jurors had already been struck with peremptory strikes and stated, "All right. Now, that issue I think is moot because the way that you guys exercised your strikes, they're off. They're not on." Defense counsel consulted with Gennusa, then informed the trial court that, because Jurors 2 and 8 had previously been struck, Gennusa was "prepared to go forward with the jury that we have."

When trial commenced, before the jury was seated, defense counsel again moved that Gennusa not be shackled and stating, "[I]f they can articulate, Judge, that my client has been violent or untrustworthy in the jail, I certainly would want to hear that but I've not been informed of anything like that and I think just having a blanket policy that we're gonna shackle people who are unfortunate enough to

6

not have money to make a bond is wrong." The trial court questioned the deputies regarding why Gennusa was shackled, and the deputies stated that it was simply their policy to shackle people who were in custody.

The trial court clarified: "I want to make sure that the record is clear that he was seated in a position where the jury could not see that he was shackled." The trial court denied the motion to remove the shackles, and the record reflects that the trial court and deputies intended that Gennusa would be positioned so that the restraints would not be visible to the jury. If he needed to move, the trial court would "take a break" so that the jury would not see the shackles.

## B.    Standard of Review and Relevant Law

The United States Constitution forbids the routine use of visible shackles on defendants during trial. *Deck v. Missouri*, 544 U.S. 622, 624, 626–29 (2005); *Ex parte Chavez*, 560 S.W.3d 191, 201 (Tex. Crim. App. 2018); *Bell v. State*, 415 S.W.3d 278, 281 (Tex. Crim. App. 2013). When the jury sees the defendant in shackles, his constitutional presumption of innocence is undermined. *Bell*, 415 S.W.3d at 281–82. Thus, the trial court should make all efforts to prevent a jury from seeing a defendant in shackles unless there has been a showing that there are extreme or exceptional circumstances requiring a need for such restraints. *Id.*

"Even when shackles are not visible to the jury, however, shackling a defendant during trial is non-constitutional error in violation of the common law

unless it is necessary for a particular defendant in a particular proceeding." *Chavez*, 560 S.W.3d at 202. For shackling to be justified, "the record must manifest the trial judge's reasons for restraining a defendant," and a trial judge errs in ordering shackles if "the record fails to detail the grounds for restraint." *Id.* (quoting *Bell*, 415 S.W.3d at 281). Further, those grounds must articulate why shackling is "necessary for a particular defendant in a particular proceeding." *Bell*, 415 S.W.3d at 281, 283 (holding that trial court erred when it made no particularized finding articulating reason for shackling defendant, instead expressing "a generalized concern for courtroom security").

We review the trial court's ruling for abuse of discretion. *See Bell*, 415 S.W.3d at 281; *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991). If we conclude that the use of shackles constituted error, then we must determine whether it was harmful. *Bell*, 415 S.W.3d at 281–83 (holding that visible shackling without justification is constitutional error, but improper use of non-visible shackles is non-constitutional error to be considered under Texas Rule of Appellate Procedure 44.2(b)); *see* TEX. R. APP. P. 44.2 (setting out standard for both constitutional and non-constitutional harm analysis); *see also Chavez*, 560 S.W.3d at 201 ("Even when shackles are not visible to the jury, however, shackling a defendant during trial is non-constitutional error in violation of the common law unless it is necessary for a particular defendant in a particular proceeding.").

## C. Analysis

Gennusa moved to have his leg shackles removed prior to the start of trial, and the trial court denied the motion without making any particularized findings regarding why it was necessary to restrain Gennusa. The only reasons set forth in the record were a general policy of leaving restraints on people who were "in custody." This is insufficient justification for shackling Gennusa during the guilt-innocence phase of trial, and thus we conclude that the trial court abused its discretion in denying Gennusa's motion remove the shackles. *See Bell*, 415 S.W.3d at 281, 283.

"Whether this error is of constitutional dimension in that it deprived [Gennusa] of his presumption of innocence turns on an additional inquiry: whether the record shows a reasonable probability that the jury was aware of [his] shackles." *Id.* at 283. "Shackles are considered visible for constitutional purposes if 'the record reflects a reasonable probability that the jury was aware of the defendant's shackles.'" *Chavez*, 560 S.W.3d at 201 (quoting *Bell*, 415 S.W.3d at 283). Here, the trial court stated on the record that the shackles would not be visible to the jurors because of how Gennusa was positioned in the courtroom. The record also reflected that the trial court intended to take measures to ensure that the jury did not see the shackles if Gennusa needed to move. After these statements were made on the record, defense counsel never raised the issue of shackling again

9

or expressed any concern that the jurors had an opportunity to see the shackles. We conclude that the record reflects no reasonable probability that the jury was aware of Gennusa's shackles. *See id.*

Gennusa argues that Juror 12 was aware of the shackles because he saw them during voir dire. We observe, however, that after Juror 12 saw the leg restraints, he indicated that he would not use that information in deciding Gennusa's guilt or innocence, and Gennusa affirmatively approved Juror 12's seating on the jury. There is no indication that Juror 12 had any further chance to observe Gennusa's restraints or that he was aware whether they remained in place or not. The fact that Juror 12 saw the restraints during voir dire—a concern which Gennusa effectively waived by agreeing to have Juror 12 seated on the jury—does not establish a reasonable probability that Juror 12 or any other member of the jury was aware that the shackles were still in place during the trial. Accordingly, we conclude that we must review this error for non-constitutional harm. *See id.*

Under Rule 44.2(b), any non-constitutional "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). In assessing the likelihood that the jury's decision was adversely affected by the error, important factors to consider

include the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id*. The analysis may include whether the State emphasized the error and whether overwhelming evidence of guilt was present. *Id.*

The record does not show that the jury saw or was otherwise aware of Gennusa's shackles during the guilt-innocence phase of trial. There is no indication that Gennusa's shackles hampered his ability to participate in the trial or to communicate with his counsel. Furthermore, significant evidence supports the finding of guilt. Marrder, Rhonda, and Howard all identified Gennusa in court as the man who forced his way into the Rogers' home and assaulted Howard. Roulaine and Officer Villareal likewise testified about finding Gennusa covered in blood at the nearby dance studio immediately following the burglary and assault. Thus, considering the character of the shackling error in connection with the strong evidence of Gennusa's guilt, we conclude that the error did not affect any substantial right. *See* TEX. R. APP. P. 44.2(b); *Schmutz*, 440 S.W.3d at 39.

We overrule Gennusa's first issue.

## Jury Argument

In his second issue, Gennusa argues that the trial court abused its discretion in allowing the State to make an improper jury argument.

## A. Relevant Facts

During the punishment phase, the State began its jury argument:

[The State]: Ladies and gentlemen, this was not a targeted attack. Yeah, it wasn't. That makes it even scarier. He had no idea who these people were, where they lived. He could have gone into your house, your house, to your house.

[Gennusa]: Objection, Your Honor. Improper argument.

[Court]: Overruled.

[The State]: He could have gone to anyone's house. It just happened to be the Rogers. . . .

The State continued its argument regarding other aspects of the case and Gennusa's defense that his alleged mental illness was mitigating factor in assessing his punishment. The State pointed out the violent nature of Gennusa's actions and his criminal record, among other factors. The State then concluded, "Again, this wasn't a targeted attack and that makes it even worse and as citizens of Harris County, I am asking you to sentence this man to prison. I'm asking you to take this man off the streets, and I'm asking you to keep Harris County safe. Thank you."

## B. Standard of Review

As a general rule, appropriate jury argument falls within only four areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) a plea for law enforcement. *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019). The focus, therefore, has always been upon encouraging the jury to decide the case on the

evidence in front of it rather than encouraging juries to reach a decision based upon information outside the record. *See id.* at 240. This is because improper references to information outside the record are generally designed to arouse the passion and prejudice of the jury, and, as such, are inappropriate. *See id.* Further, arguments must stick to matters that are in evidence or inferable from the evidence; it cannot be "abusive or inflammatory." *See id.* at 241.

To preserve a complaint that jury argument was improper, a defendant must lodge a "proper objection," such as asserting "that the argument was outside the record, was not a reasonable deduction from the evidence, was not an answer to argument of opposing counsel, and was not a plea for law enforcement." *Hougham v. State*, 659 S.W.2d 410, 414 (Tex. Crim. App. [Panel Op.] 1983); *Vasquez v. State*, 501 S.W.3d 691, 705 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). "Ordinarily, an objection to 'improper argument' is too general to preserve error." *Miles v. State*, 312 S.W.3d 909, 911 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (citing *Hougham*, 659 S.W.2d at 414 and collecting other cases on objections to jury argument). Statements such as, "We will object to this line of argument" are "insufficient to preserve error" regarding a claim of improper jury argument because they are "too general to apprise the trial court of the ground" for a defendant's objection. *Hougham*, 659 S.W.2d at 414; *see* TEX. R. APP. P. 33.1(a)(1)(A) (requiring, as prerequisite to review, that objection "stated the

13

grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context").

## C. Analysis

The State argues that Gennussa's general objection that the State's comments that "this was not a targeted attack" and Gennusa "could have gone into your house, your house, to your house" were "improper argument" is too general to preserve anything for our review. We agree. A general objection like the one Gennusa made here can be sufficient to preserve error when the record shows the trial court understood the nature of the objection. *See Gonzalez v. State*, 541 S.W.3d 306, 316 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Vasquez*, 501 S.W.3d at 705 (trial court's understanding of objection may be evidenced by comments or admonitions after its ruling). However, nothing in the record provides any context for the objection, nor did the trial court make further rulings that would make the ground or grounds for Gennusa's general objection clear. Gennusa did not specify at trial that he believed the State's comments encouraged jurors to abandon their objectivity, nor did he specify "that the argument was outside the record, was not a reasonable deduction from the evidence, was not an answer to argument of opposing counsel, and was not a plea for law enforcement." *See Hougham*, 659 S.W.2d at 414; *Vasquez*, 501 S.W.3d at 705. We conclude that his

14

objection to "improper argument" was "too general to preserve error." *Miles*, 312 S.W.3d at 911.

Even if this error were preserved, and assuming without deciding that the State's argument was an improper invitation to abandon objectivity, Gennusa has failed to establish that he suffered any harm. To determine whether an appellant's substantial rights were affected, we balance the severity of the misconduct (i.e., the prejudicial effect), any curative measures, and the certainty of the punishment assessed absent the misconduct. *See Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (citing *Martinez v. State*, 17 S.W.3d 677, 692–93 (Tex. Crim. App. 2000)).

Applying these factors, we conclude that the State's comments did not affect Gennusa's substantial rights. The State's objectionable comments consisted of one sentence preceded and followed by a proper discussion of the evidence and the State's argument that the offense was random, rather than targeted. Further, the severity of the misconduct as measured by the prejudicial effect of the State's remarks is slight. The jury was reminded of the State's burden of proof prior to the State's closing argument and in the court's jury charge. And the strength of the evidence supporting the assessment of a 35-year sentence was strong. As we stated above, Marrder, Rhonda, and Howard all identified Gennusa in court as the man who forced his way into the Rogers' home and assaulted Howard. The details of

15

Gennusa's assault of Howard were graphic, and Howard and Rhonda both testified about the negative impact the offense had on them physically and emotionally. The State also presented evidence of Gennusa's criminal history, including proving an enhancement based on Gennusa's previous conviction for assault against a family member as a repeat offender. Given these factors, we have fair assurance that the State's comments had little or no effect. *See Hawkins*, 135 S.W.3d at 77; *see also Franklin v. State*, 459 S.W.3d 670, 681–82 (Tex. App.—Texarkana 2015, pet. ref'd) (concluding that, although prosecutor's plea to jurors to "fight for those little girls" was improper plea to abandon objectivity, error was harmless because severity of misconduct was slight, jurors were reminded of proper burden of proof, and evidence supporting conviction was strong).

We overrule Gennusa's second issue.

## Reformation of Judgment

In his third issue, Gennusa asks this Court to modify the judgment to properly reflect that he was convicted of burglary of a habitation with intent to commit aggravated assault.

The record here, including the indictment and jury charge, reflect that Gennusa was charged with and convicted of burglary of a habitation with the intent to commit aggravated assault. However, the judgment of conviction erroneously

16

states that he was convicted of burglary of a habitation with the intent to commit theft.

"This court has the power to modify an incorrect judgment to make the record speak the truth when we have the necessary information to do so." *Cazarez v. State*, 606 S.W.3d 549, 557–58 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing TEX. R. APP. P. 43.2(b) and *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993)); *see also Pfeiffer v. State*, 363 S.W.3d 594, 599 (Tex. Crim. App. 2012) ("[W]hen a defendant appeals his conviction, the courts of appeals have the jurisdiction to address any error in that case."). "This includes the authority to reform a judgment to reflect the correct offense." *Cazarez*, 606 S.W.3d at 558 (reforming judgment to reflect correct degree of theft); *see Pfeiffer*, 363 S.W.3d at 599; *see also Jackson v. State*, 288 S.W.3d 60, 64 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (reforming judgment to reflect that appellant was convicted of aggravated assault and not "aggravated assault against pb servant").

The record here reflects that Gennusa was convicted of burglary of a habitation with the intent to commit aggravated assault, rather than with the intent to commit theft. Accordingly, we reform the judgment to reflect the correct offense.

We sustain Gennusa's third issue and modify the judgment to reflect the correct offense—burglary of a habitation with the intent to commit aggravated assault.

## Conclusion

We modify the judgment to reflect that Gennusa was convicted of burglary of a habitation with intent to commit aggravated assault. We affirm as modified.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).